MRS. LILLIE SMITH, Appellant, v. CLAUDE SMITH,
LUTHER T. SMITH, DAVID SMITH, MAUDE S.
BURTON, MRS. NOLA S. RICHMOND, MRS.
LORENE S. BOONE, and MRS. MYRTLE S.
CULVER, Appellees.—397 S.W.(2d) 186.

Western Section at Jackson. September 3, 1965.

Certiorari Denied by Supreme Court December 20, 1965.

David G. Caldwell and Miles & Miles, Union City, for appellant.

Charles E. Maness and Heathcock & Cloys, Union City, for appellees.

BEJACH, J. In this cause, Mrs. Lillie Smith, a widow 87 years of age and a citizen and resident of Obion County, Tennessee, who was defendant in the lower court, appeals from a judgment of the County Court of Obion County appointing a conservator of her estate. In this opinion, the parties will be referred to, as in the lower court, as petitioners or plaintiffs and defendant, or called by their respective names. The petitioners were three sons and four daughters of the defendant. Two other sons, Lemmie Smith, who, with his wife and daughter, are living with defendant, and Lesley Smith, called "Bobby", did not join in the petition. They were, however, served with copies of the petition and appeared at the hearing.

The record shows that since the death of their father, W. L. Smith, who died August 22, 1964, the relations between Lemmie Smith and his brothers and sisters, with the exception of Leslie (Bobby) Smith, have been strained. Under the provisions of the will of W. L. Smith, defendant was devised and bequeathed a farm of 114 acres in Obion County, Tennessee, and $13,500 in currency, which she took from the bolster of their bed about the time of his death. Defendant can neither read nor write, and she sustained a broken hip about nine years ago. It is also true that W. L. Smith, defendant's husband, could neither read nor write. A photostatic copy of his will is in the record, and he signed same by making his mark.

The proceedings in this cause were conducted under the provisions of Chapter 280, Public Acts of 1955, carried forward into the Code as sections 34-1008 to 34-1017 T.C.A.

The petition in this cause was filed September 4, 1964. It alleges that defendant is a widow, 87 years of age, that her husband W. L. Smith died testate on August 22, 1964, and that the estate of defendant consists of a farm of 114 acres and $13,500 in money, left to her by the will of W. L. Smith, together with a checking account of a little over $400.00 which is deposited in the Bank of Elbridge, at Elbridge, Tennessee. The petition also alleges, "By reason of her infirmities, the defendant is not capable of looking after either her person or her estate, so that it would be to her manifest interest that a conservator be appointed for her. She has been almost completely confined to her home for the past several years on account of a heart condition accompanied by hardening of the arteries, which has, to some extent, interfered with her mental processes."

As is required by section 34-1010 T.C.A., the County Judge appointed a guardian ad litem for defendant and also appointed two reputable physicians as is therein required, said physicians being Dr. L. W. Jones and Dr. Harold B. Butler. The guardian ad litem filed an answer submitting the matter to the judgment of the Court. Mr. J. Paul White, a member of the Union City bar, was first appointed guardian ad litem; but, when he became ill and was unable to serve, the Court appointed as substitute guardian ad litem, his law partner, Mr. Charles B. Fields.

The defendant, through her own counsel, also filed an answer in which she admits that her estate consists in the main of a farm of 114 acres and $13,500 left to her by her husband in his will, which amount, however, has not yet been turned over to her (by the executors of her husband's will), and that she has a checking account of

approximately $400.00 in the Bank of Elbridge. Her answer emphatically denies that she has infirmities either of the body or the mind that would render her incapable of either looking after her person or her estate, and denies that it would be to the manifest best interest of either her or the estate to have a conservator appointed for her. Her answer "avers that Leslie (Bobby) Smith and Lemmie Smith have been kind and considerate of her and that several of the petitioners have adopted not only now, but in the past, an attitude towards her which has not been kind and considerate and that, apparently, they are continuing this same course of conduct, all of which is most embarassing and humiliating to her. She avers that Lemmie Smith and his wife Hannah Smith are living with her at her request, and are being very kind and considerate of her. She avers and verily believes that this petition is not filed in good faith, but is filed because of some jealousy upon the part of the other children and is filed because they feel that she might favor the two sons who have been so good to her; namely, Lemmie and Leslie (Bobby) Smith. She avers that her mind is as alert as it has ever been and, while she is confined at her home part of the time, it is because of arthritis and a heart condition, but she denies that this condition or any hardening of the arteries or other condition has interfered in any way with her mental processes. She denies that a conservator is needed for her or a guardian ad litem, and she again avers that she is able, both mentally and physically to look after her own affairs."

The reports of the two physicians will be copied in full. The report of Dr. L. W. Jones, is, as follows:

October 9, 1964

Judge Dan McKinnis
Union City, Tennessee

Re: Mrs. Lilly Smith

Dear Judge McKinnis:

Patient came in this date for examination and evaluation per request of Judge Dan McKinnis. Patient is an 87 year old white female who related she was 77, and after interview and examination, diagnostic impressions are as follows:

1. Generalized arteriosclerosis.

2. Cerebral arteriosclerosis.

3. Parkinson's disease (palsy, bilaterial), due to cerebral arteriosclerosis.

4. Chronic brain syndrome due to cerebral arteriosclerosis, mild to moderate, with slight memory impairment.

5. Probably arteriosclerotic heart disease, mild. It is my medical opinion that this lady has no psychosis, she does have the above organic diseases, and the above are mostly chronic type illnesses or diseases, and would be expected or anticipated to slowly progress. In view of the above, it is felt from a medical standpoint, that she will probably need a conservator for her estate, at least if not for the present time, she would some time in the near future.

Sincerely yours,
L. W. Jones, M. D."

Dr. Butler's report is in the words and figures, as follows:

"October 15, 1964

Mr. Dan McKinnis
Obion County Court House
Union City, Tennessee

Re: Mrs. Lillie Smith
Route 2
Hornbeak, Tennessee

Dear Mr. McKinnis:

The above patient was seen on October 10, 1964, with the following diagnosis: 1. arteriosclerosis, generalized, 2. Cerebral arteriosclerosis, 3. Parkinson's disease (bilateral tremor of uppoer extremities), 4. arteriosclerotic heart disease with congestive heart failure.

This patient demonstrates mild memory impairment due to the above, but is not mentally incompetent nor is she phychotic.

Sincerely yours,
Harold D. Butler, M. D."

The appointment of a conservator in the instant case was made under authority of the first paragraph of section 34-1008 T.C.A., which is as follows:

"If a person by reason of advanced age or physical incapacity or mental weakness is incapable of managing his own estate, the county court, or the probate court in those counties having such a court, of the county wherein such person resides may, upon the petition of such person or one (1) or more of his friends or relatives, appoint a conservator to have charge and management of the property of such person, and if the court deems it advisable, also to have charge and

custody of the person subject to the direction of the appointing court.''

The decree from which the defendant has appealed in the instant case is in the words and figures as follows:

''The above styled cause came on to be heard before the Honorable D. W. McKinnis, Jr., Judge of the County Court of Obion County, Tennessee, on November 5, 1964, upon the petition for the appointment of a conservator of the person and estate of the defendant, Mrs. Lillie Smith, the personal answer of Mrs. Lillie Smith, defendant, by her counsel of record, the answer of Charles B. Fields, Guardian ad Litem for the defendant, Lillie Smith, the individual reports of Drs. Laurence W. Jones and Harold Butler, reputable physicians duly authorized to practice medicine in this State and each of whom has had more than three years of actual practice, made after their mental and physical examination of the defendant, Lillie Smith, and the testimony of witnesses in open court, from all of which it appeared to the Court and was adjudged and decreed that the defendant, Lillie Smith, is a widow eighty-seven years of age, can neither read nor write, has had no business experience, and by reason of her advanced age and physical incapacity, is incapable of managing her business affairs or her estate which she has acquired under the will of her late husband, W. L. Smith, who died testate on August 22, 1964.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED THAT by reason of the advanced age and physical incapacity of the defendant, Lillie Smith, and her inability to look after her business affairs and estate, that a conservator should be ap-

pointed to have charge and management of her property and estate.

It is further ordered, adjudged and decreed that Lemmie Smith and Luther Smith be appointed as co-conservators of the estate of their mother, Lillie Smith, upon their qualification and their execution of a corporate surety bond in the penalty of $14,000.00; that, in the event that they or either of them be unwilling to qualify as co-conservators of the estate of their mother, Paul G. Hudgins be appointed as conservator of the estate of Lillie Smith upon his qualification and execution of a corporate surety bond in the penalty of $14,000.00; and that, in the event Paul Hudgins shall fail or refuse to qualify as such conservator, Virgil Roberts, be appointed as conservator of the estate of Lillie Smith upon his qualification and execution of a corporate surety bond in the penalty of $14,000.00.

It is further ordered, adjudged and decreed that the costs of this cause shall be paid by the defendant or out of her estate.

To the foregoing action and decree of the Court the defendant excepted and prayed an appeal therefrom to the next term of the Court of Appeals of Tennessee to be held at Jackson, which appeal was granted upon the condition that defendant execute and file with the Clerk of the Court a good and sufficient appeal bond in the amount of $250.00 within thirty days from the date of this decree, and 60 days are allowed the defendant to prepare and file her bill of exceptions.''

Defendant's appeal was perfected; and, as appellant, defendant has filed in this Court four assignments of error, which are as follows:

## "I.

There is no material evidence to support the findings of the County Judge.

## II.

The evidence preponderates against the findings of the County Judge.

## III.

There is no evidence to support the findings and the decree of the County Judge.

## IV.

The County Court erred in its final decree in ordering, adjudging and decreeing that by reason of advanced age and physical incapacity of Lilly Smith and her inability to look after her business affairs and estate that a conservator should be appointed to have charge of her property and estate."

■■■ This cause comes to us under the provisions of section 27-303 T.C.A., with a presumption of the correctness of the judgment or decree of the trial court unless the preponderance of the evidence is otherwise. This makes necessary an examination of the evidence for the purpose of determining where the preponderance lies.

As proof in chief, in addition to the certificates of the two physicians, which have been quoted above, petitioners introduced only one witness, Mrs. Lorene S. Boone, a daughter of defendant. From her testimony, on direct examination by Mr. Maness, we quote as follows:

"Q Now, have you had occasion during your weekly visits within the ten years since your mother broke her

hip to observe the general condition of your mother's health?

A  Sure I have. Her health gradually went down.

Q  Suppose you explain to the Court in your own words what you observed in the way of changes in your mother's general condition of health within the last 10 years.

MR. FIELDS: Let's confine it to within the last year rather than ten years.

A  Well, her health became gradually worse and she told me the same things two or three times.

Q  Within the last year, have you continued to visit her on frequent occasions?

A  I certainly have.

Q  Tell the Court one or more instances you observed that her memory is failing?

A  Just recently after my daddy was buried, she would up and tell me about the funeral and I was there. She would tell me how nice she put him away and we picked out the casket. Her memory wasn't anything much. She didn't know who was there or anything.

Q  Mrs. Boone, since your mother's accident and in the past years you say her health has been declining, has she been confined to a wheel chair?

A  No, this is the first time I have seen her out of the wheel chair since she broke her hip.

Q  How long was she in  a wheel chair?

A  It's been nine years since she broke it.

Q Has she been able to roll herself around by using the wheels?

A Yes, through the house she did, but she always had to have help when she was carried out.

Q What about your mother's educational background?

A She hasn't any education.

Q Can she read?

A Not one bit.

Q Can she write?

A Not one bit.

MR. MILES: She's been in that state all of her life. I don't think that has anything to do with it.

MR. MANESS: Certainly that is an element.

MR. MILES: Let's just stipulate what it is.

MR. FIELDS: I think we should stipulate that she can't read or write.

MR. MANESS: If we are going to have a trial, we have got to get something in the record.

MR. MILES: I am agreeing that she can't read or write.

Q Mrs. Boone, do you know of your own personal knowledge whether or not your mother has ever had occasion to look after any business of the family?

A No.

Q Who always did that?

A My dad.

MR. MANESS: That's all.

MR. MILES: We can stipulate that she is 87 years old."

On cross examination by Mr. Miles, she stated that her father, who had looked after the business of the family during his lifetime, could neither read nor write, and that Lemmie Smith, her brother, and his wife, who are now living with defendant, helped look after her mother and father before he died. On cross examination by Mr. Fields, the guardian ad litem, Mrs. Boone testified:

"Q Do you think your mother's mental condition is strong enough that she would be persuaded to do something that wouldn't be right?

A No, I don't think so.

Q Do you think somebody living there would or could persuade her to do something. * * *

A I certainly do."

After the testimony of Mrs. Lorene Boone, petitioners rested; whereupon the defendant offered the testimony of Lemmie Smith, Charles Smith, aged 75, brother of W. L. Smith and brother-in-law of defendant, Mrs. Joe Fleming, Mr. and Mrs. J. D. Grissom, and Mrs. Lillie Smith, herself. As rebuttal witnesses, petitioners presented Mrs. Lorene Boone, Mrs. Nola Richmond, Mrs. Maud Burton, Mr. Luther Smith, Mr. David Smith and Mr. Claude Smith; after which, Mrs. Lemmie Smith testified in surrebuttal.

From the testimony of the defendant, Mrs. Lillie Smith, given on direct examination by Mr. Caldwell, we quote as follows:

"Q Mrs. Smith, how old are you and where do you live?

A  I live between Hornbeak and Elbridge and I am a 87 years old.

Q  And you are the widow of Mr. W. L. Smith, sometimes called Lum Smith?

A  Yes, I sure am.

Q  Mrs. Smith, where are you living at this time?

A  I am living at the old home place where I have lived for years to come.

Q  Who lives there with you?

A  Lemmie and his wife and daughter.

Q  And tell the Court how they treat you and take care of you?

A  They've been mighty good to me so far. They treat me as nice as anybody could. Lemmie does the feeding and we get along fine. I would rather he stayed there as any of the rest. He's kind and he will do anything that I ask him to do. They ain't a one—I offered them that place to come there and stay and wouldn't a one come and they ain't a one of them called me since he died. Lorene called me two or three times—they don't care anything about me. They just want what I've got and that's all.

Q  Before Mr. Lum died, where did Lemmie live?

A  They lived down there a short ways—about one hundred or two yards.

Q  Have you been anywhere lately?

A  I've been up here lately and been to Obion.

Q  Who did you go to see in Obion?

A  I went to see Mary Sanford—Lum's sister.

150

Q  After Lum died where did you go?

A  I went to the bank to hear his will read.

Q  What happened at the bank?

A  Mr. Green counted the money. Bobby and Lemmie are the directors.

Q  And what business did Mr. Green do?

A  He is cashier of the bank.

Q  What did you go down to the bank for that day?

A  They had me to go to see that money counted.

Q  Was or not the money counted out right?

A  I guess it did, as far as I know.

Q  Did you go because you wanted to?

A  I went because I had to, I reckon.

Q  Who was down at the bank?

A  All the children and me.

Q  What money was counted out, tell the court what kind of bills they were in?

A  They was $100.00 bills.

Q  Mrs. Lillie Smith, state whether or not you want anyone to manage your affairs.

A  No, I sure don't. I don't want nobody. I don't need none.''

From Mrs. Smith's testimony, on cross examination by Mr. Heathcock, we also quote, as follows:

''Q  Mrs. Smith, you say except for Lemmie and his wife, your other children haven't come to see you?

A  They haven't been coming. Luther came up there and stayed an hour, I have known Lum to ask him to stay night after night and he wouldn't do it. He would go back home.

Q  Before his death, they were over there frequently doing whatever they could, weren't they?

A  Yes, when they found out he was near death, but I was there by myself when he had a stroke.

Q  Wasn't Lemmie and his wife on the place?

A  They had gone to the lower place to poison some Johnson grass.

Q  And you were by yourself?

A  Yes, I was by myself.

Q  Up until the death of your husband, the other children visited you, didn't they?

A  There's Dave hasn't been in the house for a year. When he found out Lum was near death, he left and he was at Obion when he died.

Q  Going back to your daughters, Mrs. Boone and your other daughter came down regularly to see you before your husband's death and did what they could in helping keep house, didn't they?

A  Yes, that's what they say.

Q  I'm asking you what you say.

A  I don't approve it. They come and—Let me talk a little bit—They was down there one Sunday evening and Lum tried to get them to stay a few days. He was in the bed sick. There was such a crowd there and they wouldn't a one of them stay. That's the way it goes.

Lemmie and his wife stayed. I called on Lemmie and his wife. They didn't want to give up their home and stay, but they did and stayed and they are there now. They didn't want Lemmie to stay there. They are just jealous. They don't want Lemmie to stay there and somebody's got to stay with me.

Q To help you and look after the house?

A Yes.

Q You recognize the fact that, on account of your health and age, you need someone there?

A As long as we was well, we stayed there alone, but after his health got bad we couldn't do that.

Q From your standpoint, don't you think it is for your best interest that someone—I'm not suggesting who—help you attend to your business affairs?

A Well, Lemmie can do that. I have got no business to do. Lemmie can write and take it to the bank and Mr. Green will come and give me any service I have to have.

Q You haven't been looking after the banking business before your husband died, except to have someone sign the check?

A No, he always done that himself.

Q Your husband looked after his own business?

A Yes, and mine too. I had but very little to look after.

Q And up to his death, you didn't have any business affairs?

A No, none whatever—he did it all himself.

Q And you haven't had any experience about business affairs, have you?

A No.

Q And you should have some help in that regard?

A That was Lum's request that if Lemmie stayed with me, that he was to get what I had when I died.

Q Since you broke your hip, you haven't been able to get the work done, have you?

A I have done all the work—I ironed and mopped. I couldn't wash. I have the will power, if I just had the strength.

Q And you are not able to keep house by yourself, are you?

A I know it. Lemmie and his wife are there with me.

Q And you haven't had the experience to look after bank accounts and the renting of farm lands or things of that sort, are you?

A No.

Q Do you have any cattle on the farm?

A No, they sold all of the cattle we had.

Q Everything is disposed of?

A Yes, they sold the cows and hogs and I've got a pair of mules there and that's all of the live stock outside of what belongs to Lemmie.

Q Now, your husband, through the years, has liked to keep cash on his person, hasn't he?

A Yes, he would.

Q And within a short time before his death he did have several bundles of money there?

A Yes.

Q  And did he count them?

A  I guess he did, but I never did see him.

Q  But he did have them—You saw the sacks?

A  Yes, I saw the bulk of them.

Q  And you saw that it was money?

A  Yes.

Q  And you saw at least three different sacks of money during the last several months?

A  No, I seen two bundles—that's all.

Q  You saw two or three bundles?

A  No, there was no three to it—just two.

Q  How did they compare with each other in size?

A  I don't remember. One was a little bit larger than the other, but they were all $100.00 bill.

Q  You know which bundle was which?

A  No, I never—

MR. MILES : I don't know how she would answer that —There were two bundles—when you say 'which was which'—

Q  I understand from Lemmie, after your husband's death, you put one bundle in a trunk or chest.

A  Well, you misunderstood Lemmie. I had two bundles and we carried it over to the bank and Mr. Green counted it.

Q  There were two bundles of money that you found in the bed of your husband after he died?

A  Yes, it was under the bolster and I put it up.

Q  You put these two bundles in the chest or the trunk?

A  I put them in my pocketbook.

Q  Was it in your pocketbook all of the time after your husband's death?

A  No, I done and put it in another place and I am not going to tell you where I put them.

Q  You took it all down to the bank?

A  Yes, I took it down to the bank and Green counted it. It belonged to me. I helped to work and make it. I worked hard as he did. I chopped cotton and it is just as much mine as his. I have always helped and done my duty in every way.

Q  Did you know what was in that will until you heard it read?

A  No, I didn't.

Q  You didn't know that he said all cash money went to you?

A  No, not until I heard it read.

Q  You just know that it belonged to you?

A  Yes, it ought to be mine because I helped to make it, and, if that's taken away from me, I won't have any.

Q  That petition filed here is for your interest so that someone could conserve the property and see that you get the benefit of it.

A  I think Lemmie will do right about it. He has one boy in college and one going to Memphis. Lemmie helped Lum before he passed out and he tended to his business and he would go with him to the bank and he knows more about it than any of them.

Q There's bad feeling between Lemmie and Bobby and the other children since your husband's death—

A Yes, there's been bad feeling and they have done everything to Lemmie they could.

Q Up until your husband's death, you didn't get away from the house, did you?

A No, I hardly went off the place.

Q You have done more traveling since he died?

A I have made more trips up here, and then I went to Obion and to Elbridge. No, I didn't go. He couldn't travel, and I didn't go but very little. We had an old truck but we couldn't drive and he wouldn't stop Lemmie from work to make a trip at all.

Q Did you count that money you carried to the bank?

A No, I never.

Q You never told Lemmie that there was $13,500?

A No.

Q Have you been to Union City to be examined by doctors in connection with this hearing on at least one other occasion, and you also came up here to make a will recently?

A Yes.

Q Was that just within the last week?

A Yes, I came up here and made me a will.

Q Do you know how much you own, Mrs. Smith?

A Well—

Q Do you know what your estate under the will of your husband consists of?

A No, I really don't know, in a way.

Q Do you have an idea?

A I don't know what they valued that place at.

Q I'm not asking you that—Do you know what he left to you under the will?

A Yes, he left me that farm and what money there was. That's what he left me, because the cows and everything they sold them. They are all sold.

Q You have a little money of your own that you didn't get from your husband's estate. You had a little account, didn't you?

A It didn't amount to much. Yes.

Q I'm not asking you what the contents are, but do you know what provisions you made in that will?

MR. MILES: I am objecting to that. I am instructing her not to answer.

Q Do you remember what you put in that will?

A No, I ain't going to tell.

Q Do you know what you put in to it?

A (Witness does not answer)

Q Mrs. Smith, do you know what was put in the will?

A No, I don't remember that what all. I ain't going to tell you."

From the redirect examination by Mr. Caldwell, we quote as follows:

"Mrs. Smith, just a final question, do you want to have a conservator appointed to take care of your business.

A No, I want Lemmie to take care of it—Bobby and Lemmie are the directors and if Lemmie stays there, I don't want nobody else to have any say so over it.

Q Are you able to manage your business?

A Yes, everything in the house I can manage. All I've got is that little dab of money and that little farm and it wouldn't amount to much.

Q How much farm?

A 114 acres of hill farm is all it is.

Q Is woods on any of it?

A Yes, it is mostly woods.

Q How much farm land is on the farm?

A Well, there was five acres of cotton on it this year and we just pasture it. We always had stock on it.''

██ Without quoting the testimony of the other witnesses, we think the overwhelming preponderance of the evidence is to the effect that because of her broken hip, Mrs. Smith is physically disabled, but that her mind and memory are good and normal, and substantially as good as they ever were. No disinterested witness testified for petitioners, whereas four disinterested witnesses appeared for the defendant. It is apparent from the testimony that Mrs. Smith, who can neither read nor write, helped her husband, W. L. Smith, who also could not read or write, accumulate a substantial estate, most of which was left to her by his will. His will appoints Lemmie Smith and Bobby Smith as executors and provides that compensation in the amount of $50.00 each shall be paid to them for their services. His will leaves to Mrs. Lillie Smith the home place of about 114 acres, and ''any

cash money on hand". All the balance of his property, real, personal and mixed, he leaves share and share alike to his children, Leslie Claude Smith, Mrs. Nolla Smith Richmond, Mrs. Maud Smith Burton, Mrs. Lorene Smith Boone, Mrs. Myrtle Smith Culver, Luther T. Smith, David Smith, Bobby Smith, and Lemmie Smith, share and share alike, with a provision that, "should any one or more of the beneficiaries named in this will object to the distribution as made, or attempt to defeat the provisions of this will, said persons shall receive the sum of $100.00 and no more.

Section 34-1008 T.C.A. authorizes the appointment of a conservator, "if a person by reason of advanced age or physical incapacity or mental weakness is incapable of managing his own estate."

It will thus be seen, as the disjunctive "or" is used, that authority is given for the appointment of a conservator on account of "advanced age or physical incapacity", even though the person for whom a conservator is sought is wholly capable mentally. Evidently, the County Judge, in the instant case, was of opinion that the language quoted authorized him to appoint a conservator for Mrs. Smith. The fallacy of his reasoning is, in our opinion, that the defendant, Mrs. Smith, although "by reason of advanced age or physical incapacity is incapable of managing her own estate", she has a son of her own choosing who is physically, as well as mentally, capable of attending to her affairs for her. If no such agent were available, we would not question the propriety of the appointment of a conservator; but where defendant is, as the record in this cause discloses, fully capable of choosing her own agent, we think no conservator should be appointed. On the contrary, in that situa-

tion, in our opinion, she should be allowed to manage her own affairs through the agent of her choice.

We have found only one reported case referring to the provisions of sections 34-1008 T.C.A., et seq. That case is Tucker v. Jollay, 43 Tenn.App. 655, 311 S.W.(2d) 324. It holds, with reference to said Code sections, that a person for whom a conservator has been appointed under same, may nevertheless be capable of making a will. It throws little, if any, light on the issues involved in the instant case.

■ While section 34-1008 T.C.A. authorizes, in a proper case, the appointment of a conservator because of incapacity on account of advanced age or physical incapacity, as distinguished from mental weakness, it is our opinion that where the defendant is not also disqualified on account of mental weakness, a conservator should not be appointed merely because of advanced age or physical incapacity. Proper construction of the statute justifies placing primary emphasis on the words "or mental weakness". Such emphasis should, in our opinion, be required by the public policy of this State.

The law in other jurisdictions is in accord with the above suggested rule of construction. On that subject, from 25 Am.Jur.,—Guardian and Ward,—section 19, page 19, we quote, as follows:

"The fact that a person is aged or infirm or that his mind is, to some extent, impaired by age, does not justify the appointment of a guardian of his property. Accordingly, it has been held that an aged person is not of unsound mind so as to require a guardian of his estate merely because he has not sufficient strength of mind and ability to transact his business affairs

with ordinary care and prudence, if he is capable of transacting the ordinary business involved in taking care of his property, and understands the nature and effect of what he does, and can exercise his will concerning it with discretion, notwithstanding the influence of others. The fact that an old man desires to marry does not constitute sufficient ground for the appointment of a guardian of his property. On the other hand, in most jurisdictions unsoundness of mind or imbecility, resulting from old age, justifies the appointment of a guardian, and in some jurisdictions there are statutes, held to be constitutional, which authorize the appointment of guardians of the estates of those who because of old age, are incapable of managing their property.

As a general rule, mere physical defects and infirmities, whether resulting from age, birth, accident, or disease, do not justify the appointment of a guardian and will be considered only insofar as they affect mental condition. In fact, although there is authority which seemingly points to a contrary conclusion, it has been held that a statute which makes physical disability or infirmity a ground for appointment of a guardian of the property of a person mentally competent, but physically incompetent, is unconstitutional as an unwarranted abridgement of the liberty of such person and an unwarranted abridgement of the right to acquire, possess, and protect property. Whether persons born deaf and dumb are to be treated judicially as mentally incompetent to manage their affairs depends on the evidence they are able to give as to the possession of capacity.''

■ We deem it unnecessary to pass on the constitutionality of section 34-1008 T.C.A., and, for the purposes of this opinion, it will be assumed that it constitutes a valid legislative enactment. It is apparent to us, however, that if, ''The fact that an old man desires to marry does not constitute sufficient ground for the appointment of a guardian of his property'', then, in the instant case, the fact that the defendant may prefer, and perhaps has preferred, two of her children over the other seven, is not sufficient ground to justify the appointment of a conservator who may, during the brief remainder of defendant's life, prevent distribution of her estate to those two preferred children. It may, indeed, be that defendant in the instant case has already made a will which excludes the seven petitioners; but if so, under authority of Tucker v. Jollay, 43 Tenn.App. 655, 311 S.W.(2d) 324, so far as the evidence in the record before us indicates, she was mentally capable of making such a will. Certainly, the overwhelming preponderance of the evidence establishes the fact that defendant, with the assistance of the agent, or agents, chosen by her, is fully capable of managing her own person and estate without the intervention of a conservator.

As stated above, this cause comes to us under the provisions of section 27-303 T.C.A., with a presumption of the correctness of the judgment or decree of the trial court, unless the preponderance of the evidence is otherwise. As is also stated above, the overwhelming preponderance of the evidence is, in the opinion of this Court, contrary to the ruling of the trial judge. If, then, the decree were to be affirmed, it would have to be exclusively on the ground that, as a matter of law, old age and physical incapacity, without any other reason, justified the appointment of a conservator. We are unwilling to

take that position or to establish such a rule in Tennessee. Defendant's assignments of error will, therefore, be sustained, the cause reversed, and the petition filed in this cause dismissed.

The costs of the cause will be adjudged against the petitioners and their sureties on the cost bond filed in the lower court.

Avery, P. J. (W.S.), concurs.

Carney, J., dissents.

CARNEY, J. (dissenting). I am unable to agree with the majority of this Court that the evidence preponderates against the decree of the lower court appointing a conservator for the estate of Mrs. Lillie Smith. The decree does not provide for the conservator to have charge of the person of Mrs. Smith as is made optional under the authority of T.C.A. Section 34-1008. The decree of the lower court provides "that the defendant, Lillie Smith, is a widow 87 years of age, can neither read nor write, has had no business experience, and by reason of her advanced age and physical incapacity, is incapable of managing her business affairs or her estate which she has acquired under the will of her late husband, W. L. Smith, who died testate on August 27, 1964."

Mrs. Smith is confined to a wheelchair because of a broken hip which she sustained several years ago. However, she can walk about the house by holding on to furniture, etc. Since the death of her husband, her son Lemmie Smith and his wife have been living in the house with her and looking after her on the 114-acre homeplace which was devised to her under the will of her husband. A medical examination of Mrs. Smith during or shortly

before the trial below revealed that Mrs. Smith suffers from generalized arteriosclerosis, cerebral arteriosclerosis, Parkinson's disease and mild impairment of her memory due to cerebral arteriosclerosis and arteriosclerotic heart disease with congestive heart failure. Both examining physicians stated that Mrs. Smith was not mentally incompetent nor was she psychotic. However, one physician expressed the opinion ''* * * In view of the above, it is felt from a medical standpoint, that she will probably need a conservator for her estate, at least if not for the present time, she would sometime in the near future. Sincerely yours, L. W. Jones, M. D.''

The full amount of the deceased husband's estate is not shown in the record. Her son, Lemmie Smith, testified that she counted out the $13,500 which she removed from the bolster of the bed and which her husband had secreted there but she testified that she didn't count it. Mrs. Smith referred to the $13,500 as ''a little dab of money.''

Mrs. Smith has nine children, four daughters and five sons. All four daughters and three of the sons joined in the petition seeking the appointment of a conservator for the estate of their mother. Mrs. Smith is now estranged from all of these seven petitioners. However, by will dated November 27, 1963, Mrs. Smith's husband, W. L. Smith, devised his residuary estate to all nine of their children in equal shares. The son, Lemmie, who is now in favor with his mother and who lives in the home with her is indebted to the estate of his father in the amount of $12,500. He testified that his mother did not need a conservator. When it was suggested that he and one of his brothers who signed the petition serve jointly as conservators, he expressly refused to serve. The other son who did not join in the petition did not testify.

The Trial Judge saw and heard the witnesses including the defendant, Mrs. Lillie Smith. The statute does not require a finding that Mrs. Smith is a non compos mentis as a prerequisite to appointing a conservator.

I would affirm the decree of the lower court.